IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CR-55-TAV-HBG |
| | ) | |
| JACKSON BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Judge as may be appropriate. On November 24, 2018, law enforcement officers arrested Defendant Jackson Brown for robbery, while Brown was at the home of his father Jackie Hickey. Detectives from the Rockwood Police Department ("RPD") subsequently went to the home of Jackie Hickey and asked to search. Mr. Hickey gave oral consent and the officers searched the area where the Defendant was apprehended and seized tennis shoes belonging to the Defendant. Following further investigation and interviewing Defendant Brown, the RPD detectives returned to Mr. Hickey's house and asked about a one-dollar gold coin taken in the robbery. Mr. Hickey gave the coin to the detectives, telling them he found it in the Defendant's shoes. Two days later, RPD Detective Randy Heidle went to Mr. Hickey's house a third time and asked for consent to search. Mr. Hickey again gave consent, this time marking an "X" on a consent-to-search form.

Defendant Brown asks the Court to suppress all evidence seized in his case following the warrantless searches of his father's home, contending that his father did not knowingly and voluntarily consent. After reviewing the testimony and the exhibits in this case, as

well as the arguments of the parties, the Court finds that Defendant Brown has failed to demonstrate a legitimate expectation of privacy in his father's residence, such that he can challenge the searches thereof. However, even if Defendant Brown can challenge the searches of his father's residence, the Court finds the officers searched pursuant to Mr. Hickey's valid and voluntary consent. Finally, assuming arguendo that Defendant has standing and Mr. Hickey's consent was invalid, the Court finds that only the tennis shoes, a ten-dollar bill, a gold coin, and a gold watch would be subject to suppression. Accordingly, the Motion to Suppress [Doc. 81] should be denied.

## I.     POSITIONS OF THE PARTIES

Defendant Brown is charged [Doc. 54], along with two codefendants, with carjacking (Count One), Hobbs Act Robbery (Count 4), and brandishing a firearm in furtherance of these two offenses (Counts Two & Five). He is also charged with being a felon in possession of a firearm and ammunition (Count Three). These charges arise out of the alleged robbery of Angelleigha Qualls and Patrick Thompson in their apartment at gunpoint in the early morning of November 24, 2018. Defendant Brown and his codefendants allegedly took money, jewelry, and other items and fled in Qualls's 2013 Ford Fusion. Later that morning, Defendant Brown was arrested at the home of his father, Jackie Hickey, who subsequently consented to multiple searches of his home.

Defendant Brown asks the Court to suppress all evidence seized from his father's home, arguing that Mr. Hickey did not knowingly and voluntarily consent to the search [Docs. 81 & 92]. He contends that his father, who cannot write and probably cannot read, did not voluntarily consent but, instead, merely acquiesced to law enforcement's authority. He argues that all evidence stemming from the search of the residence, including statements he made to law enforcement and identifications of him by others, are the fruit of the unconstitutional search.

2

The Government responds that the officers searched Mr. Hickey's residence pursuant to his valid consent. It contends that Mr. Hickey's consent was not the product of duress or coercion. It also maintains that even if the search was unconstitutional, the Defendant's statements are not the fruit of that search. Instead, the Defendant gave the statements after he was arrested and voluntarily waived his *Miranda* rights in writing. The Government also argues that the Defendant's clothing seized from the Hamilton County Sheriff's Department pursuant to a state search warrant and the items seized from the victim's car are not the fruit of the search of Mr. Hickey's residence.

The parties appeared for an evidentiary hearing on February 19, 2021. Assistant United States Attorney Cynthia F. Davidson appeared on behalf of the Government. Attorney Mark E. Brown represented Defendant Brown, who was also present. Following the presentation of evidence, defense counsel asked to file his argument in writing. The Court granted this request. The Defendant filed a post-hearing brief on March 15, 2021 [Doc. 92]. The Government filed a responding post-hearing brief on March 18, 2021 [Doc. 93]. Following the filing of the transcript of the evidentiary hearing on April 1, 2021, the Court took the motion under advisement.

## II.     SUMMARY OF THE TESTIMONY

The Government presented the testimony of Detective Randy Heidle of the Roane County Sheriff's Department [Tr. at 4].[1] Detective Heidle testified that in November 2018, he was a detective for the Rockwood Police Department ("RPD") [Tr. at 5-6]. Around 4:00 or 5:00 a.m., on November 24, 2018, Detective Heidle received a call from the dispatcher to go to the Meadowview Apartments, where an armed robbery had occurred [Tr. at 6]. Upon his arrival, Detective Heidle interviewed the victims, Patrick Thompson and Angelleigha Qualls [Tr. at 7].

---

[1] The transcript [Doc. 96] of the February 19, 2021 evidentiary hearing was filed on April 1, 2021.

According to Detective Heidle the victims reported that Coy Potter and Jaret Axell came to their apartment to be tattooed [Tr. at 7]. The victims reported that shortly thereafter, Thompson answered the door, and a black male, not known to the victims, came around the corner and into the apartment [Tr. at 7]. Thompson shone a flashlight into the person's eyes, and the individual hit him [Tr. at 7]. Thompson, Qualls, Potter, and Axell ran into the bedroom, and Qualls attempted to hold the door closed [Tr. at 7-8].

Detective Heidle said the victims told him that the unknown male had a gun, pushed into the bedroom, and ordered the four occupants to the ground [Tr. at 8]. According to the victims, Axell and Potter got up and joined the black male in searching their apartment [Tr. at 8]. The victims reported that the black male took a bag of jewelry and money and then made Qualls leave the apartment with him and go to her car [Tr. at 9]. According to the victims, the black male took Qualls's keys, told her he would leave the car in the Food City parking lot in Harriman in five minutes, and drove away [Tr. at 9].

Detective Heidle stated that Qualls's car had a built-in, internal tracking device [Tr. at 9]. Law enforcement tracked the car, which stopped a several locations [Tr. at 9]. Ultimately, law enforcement found the car abandoned behind an apartment complex on Railroad Street in Dayton, Rhea County, Tennessee [Tr. at 10]. Detective Heidle, who had been processing the scene of the robbery, secured the evidence at the RPD police station before he and Captain Pittman went to Railroad Street [Tr. at 10]. Detective Heidle said he and Captain Pittman arrived at the victim's car at 7:35 a.m. [Tr. at 10-11]. He stated that by this time, law enforcement had identified the black male as Jackson Brown, based upon the victims' description and the location of the car [Tr. at 11-12]. The victims reported that the black male had recently had surgery, which was evident from staples on his torso [Tr. at 11]. Qualls's car was located one or one-half block from Brown's

father's house [Tr. at 12]. Law enforcement from Rhea County and Dayton ran Brown's name through their computer databases and learned he had outstanding federal warrant [Tr. at 11]. Shortly before Detective Heidle arrived at Qualls's car, local officers arrested Defendant Brown at his father's house [Tr. at 12]. The Government introduced the report of Rhea County Sheriff's Deputy Todd Delonardis, which states that officers arrested the Defendant in the back bedroom of 1740 Railroad Street, after "Jack Brown" gave consent to search his residence [Tr. at 13, Exh. 1]. Defendant Heidle said he was not aware of the officers searching the residence at the time of the Defendant's arrest [Tr. at 13-14].

Detective Heidle said when he arrived in Dayton, he went straight to the stolen car [Tr. at 16]. He said he contacted the victim and told her that that they had found her car but that she could not get it until the police processed it for evidence [Tr. at 16]. According to Detective Heidle, the victim agreed and asked him to call her when she could get the car [Tr. at 16]. Detective Heidle agreed that he searched the car with the victim's permission [Tr. at 16-17]. He said the officers found currency on the driver's side floorboard and a gun in the center console [Tr. at 17-18; Exh. 2].

Detective Heidle said that after he processed the car, he, Captain Pittman, and a local officer went to the Defendant's father's house [Tr. at 18-19]. He knocked on the door, and Jack Hickey answered [Tr. at 19]. Detective Heidle did not know if Mr. Hickey also went by Jack Brown, but he said the local officer recognized him as the Defendant's father [Tr. at 19]. Detective Heidle said Mr. Hickey spoke loudly, and he was told that Mr. Hickey was partially deaf, so the officers had to speak loudly to him [Tr. at 19]. Detective Heidle said he was dressed in plain clothes, and he identified himself and his partner to Mr. Hickey [Tr. at 19]. Detective Heidle said he told Mr. Hickey that he was working on a case involving Mr. Hickey's son Jackson Brown [Tr.

at 19].  He said he told Mr. Hickey that he knew the Defendant was arrested at his house, and he wanted consent to search the area where the Defendant was arrested, which he believed was the back bedroom [Tr. at 19].  Detective Heidle said Mr. Hickey gave consent for him and his partner to come inside [Tr. at 20].

Detective Heidle stated that he went to the back bedroom to look for gold coins and jewelry, which the victims had reported stolen and which the Defendant may have left during the arrest [Tr. at 20].  He said the room appeared to be used for storage, was filled with boxes, and had mattresses against the wall [Tr. at 20].  He said it did not appear to be a room where someone slept [Tr. at 21].  Detective Heidle said the only item he seized from the room was a pair of tennis shoes [Tr. at 21].  He said he asked Mr. Hickey if the shoes were his, and Mr. Hickey said they belonged to his son Jackson Brown [Tr. at 21].   Detective Heidle said the officers also recovered a ten-dollar bill from the back yard [Tr. at 21].  He said the bill was dry and had not been there long [Tr. at 21, Exh. 3].

Detective Heidle said after leaving Mr. Hickey's house, he and his partner went to the Rocky Top gas station/McDonalds in Spring City, a location where Quall's car had stopped, while being tracked earlier that morning [Tr. at 22-23].  Detective Heidle viewed the surveillance video and ate lunch, before going to the Rhea County Sheriff's Department, where he and Captain Pittman interviewed Defendant Brown [Tr. at 23].  Detective Heidle said he explained the rights waiver to the Defendant, who then signed it [Tr. at 23-24; Exh. 4].  He said he thought the Defendant understood his rights [Tr. at 24].  The Defendant then gave a statement, which Detective Heidle wrote out, and the Defendant initialed and signed [Tr. at 24].  While at the Rhea County Sheriff's Department, Detective Heidle took custody of two necklaces, one of which had a crown pendant and which were on the Defendant's person when he was arrested [Tr. at 25; Exh. 5].

6

Detective Heidle stated that he was still trying to find the gold coins and jewelry that the Defendant supposedly took, so after interviewing the Defendant, he returned to the apartment complex, where the car was found [Tr. at 26]. He said he had information that a sister or cousin of the Defendant lived at that apartment complex [Tr. at 26]. Detective Heidle stated that he spoke with a black female, who allowed him to look around her residence, but he did not find anything [Tr. at 26]. He said when he told the woman he was looking for gold one-dollar coins, she said Mr. Hickey had one of those coins [Tr. at 26].

Detective Heidle testified that he and his partner returned to Mr. Hickey's residence [Tr. at 26]. He said he told Mr. Hickey that he would like consent to look around again, because he was told that Mr. Hickey may have a gold one-dollar coin he was seeking [Tr. at 26]. Detective Heidle said Mr. Hickey got the gold coin and gave it to him [Tr. at 26; Exh. 6]. He said Mr. Hickey told him that he found the coin in Jackson Brown's shoes [Tr. at 26-27]. Following this meeting with Mr. Hickey, Detective Heidle accompanied another officer to a different residence to look for Christmas presents that had been in the trunk of the victim's car, but no one answered the door [Tr. at 27]. He then returned to RPD to secure and photograph the evidence [Tr. at 28].

Detective Heidle said he returned to Mr. Hickey's residence on November 26, 2018 [Tr. at 28]. At that time, he gave Mr. Hickey a consent-to-search form [Tr. at 28; Exh. 7]. Detective Heidle filled in the address, owner's name, date, and time on the consent form [Tr. at 29]. He asked Mr. Hickey to sign the form, but Mr. Hickey told him that he cannot write [Tr. at 29]. Detective Heidle told Mr. Hickey to make an X, and he and another officer also signed the form as witnesses [Tr. at 29]. Detective Heidle said he looked around the living room but did not search the rest of the residence [Tr. at 29]. He said Mr. Hickey said he had a gold watch that

Jackson Brown gave him [Tr. at 29].  Detective Heidle said Mr. Hickey gave him the watch and that gold watches were reported stolen in the robbery [Tr. at 29; Exh. 8].

Detective Heidle said that shortly after his arrest, Defendant Brown was transferred from Rhea County to Hamilton County [Tr. at 30].  He said on December 19, 2018, he went to Hamilton County to retrieve the clothing the Defendant was wearing on the day of his arrest [Tr. at 30-31].  He had to obtain a search warrant to get the clothing, which was a gray hoodie [Tr. at 31; Exh. 9].  Detective Heidle said he and Detective Sledge interviewed Defendant Brown a second time that day [Tr. at 31-32].  He said the Defendant again signed a waiver and gave a statement, which the detective wrote out and the Defendant initialed and signed [Tr. at 32-33; Exh. 10].

On cross-examination, Detective Heidle testified that the initial call from the dispatcher was around 4:00 a.m. or 5:00 a.m. [Tr. at 34].  After processing the scene in Rockwood, Detective Heidle went to the RPD to secure the evidence in the evidence locker and pick up his partner [Tr. at 34].  Once his partner arrived, they went to Rhea County and went directly to the vehicle, which was on Railroad Street behind an apartment complex about one block from the Defendant's father's house [Tr. at 34-35].  After processing the car, Detective Heidle went to the Rhea County Sheriff's Department, where Rhea County deputies told him where the Defendant's father lived [Tr. at 35].  He agreed that either Rhea County deputies or Dayton police officers identified the suspect he was seeking as Jackson Brown [Tr. at 35].  Detective Heidle said he next went to the Defendant's father's house [Tr. at 36].  He stated that he did not have a consent form with him at that time [Tr. at 36].  While at Mr. Hickey's house, Detective Heidle found the tennis shoes but did not find a gold piece [Tr. at 37].

Detective Heidle agreed that after going to the Defendant's father's house, he went to the convenience store [Tr. at 36].  After the convenience store, he returned to the Rhea County

8

Sheriff's Department around 1:00 p.m. to interview the Defendant [Tr. at 36]. Following that interview, Detective Heidle went to the apartment complex on Railroad Street and interviewed a female relative of the Defendant [Tr. at 36]. He said the female relative told him that the Defendant did not come to her apartment [Tr. at 36]. Detective Heidle stated the female relative allowed him to come in her apartment and look around [Tr. at 37]. While there, she told him about Mr. Hickey having a gold piece, although Detective Heidle did not recall how she knew about it [Tr. at 37]. Detective Heidle agreed that he then went to the Defendant's father's house a second time [Tr. at 37]. He said he did not have a consent form with him that day [Tr. at 37].

Detective Heidle said he had a consent form with him on his third trip to the Defendant's father's house on November 26, 2018 [Tr. at 37]. He agreed that all the information on the consent form was filled out by him, except for the "X" and the other officer's signature [Tr. at 38]. The other officer, Thomas Earl Nelson, was not from the Rockwood Police Department [Tr. at 38]. Detective Heidle stated that Mr. Hickey said he could not write [Tr. at 38]. Detective Heidle did not remember if he asked Mr. Hickey whether he could read [Tr. at 39]. Detective Heidle stated that he explained the consent form to Mr. Hickey, including that he wanted to search and that Mr. Hickey had a right for the officer not to search, but he was not certain that he read it verbatim to Mr. Hickey [Tr. at 39].

Detective Heidle testified that he only went to the back bedroom of Mr. Hickey's house the first time he went there [Tr. at 39]. He agreed the room was full of items and looked like a storage room [Tr. at 39]. He did not remember if he had to open the door to enter that room [Tr. at 40]. He said there was not a path through the boxes and items, so he had to maneuver around things [Tr. at 40]. He said he found the shoes just inside the door of the bedroom [Tr. at 40]. He agreed that his first visit to Mr. Hickey's house occurred before he interviewed Defendant

9

Brown [Tr. at 41]. He said that the RPD does not have a policy requiring the use of consent forms [Tr. at 41]. He said he felt comfortable asking Mr. Hickey for consent to search without a form, because his partner was with him and could verify that he got consent [Tr. at 41].

Detective Heidle said he did not know why the signed consent form was not included with the information that he gave to the federal agent about this case [Tr. at 42]. He said he gave Agent Jason Dobbs everything in the case and did not try to keep anything from him [Tr. at 42]. Detective Heidle agreed that the consent form is an important document in this case [Tr. at 42].

## III.  FINDINGS OF FACT

The Court makes the following factual findings in this case:

In the early morning of November 24, 2018, Detective Randy Heidle, then of the Rockwood Police Department, was called to investigate an armed robbery and theft of a vehicle from Patrick Thompson and Angelleigha Qualls. The perpetrator was an unknown black male, assisted by Coy Potter and Jaret Axell, both of whom were known to the victims. The victims reported that the black male took money and jewelry and fled in Qualls's car. Law enforcement tracked the car through an internal tracking device installed by the manufacturer and identified the black male as Jackson Brown. The car was located at an apartment complex about one block from the residence of Jackson Brown's father, Jackie Hickey. Officers arrested Brown in the back bedroom of Mr. Hickey's home, after obtaining Mr. Hickey's consent to enter to arrest Brown.

Around 7:35 a.m., and shortly after Brown's arrest, Detective Heidle reported to the scene of the abandoned car, to process it for evidence. Detective Heidle searched the car with the victim's permission and found money in the driver's floorboard and a gun in the center

10

console.  Detective Heidle then went to Mr. Hickey's residence, accompanied by Captain Pittman and a local officer.  The local officer recognized Mr. Hickey as Brown's father.  Detective Heidle, who was dressed in plain clothes, was aware that Mr. Hickey was partially deaf and that he had to speak loudly to be heard.  Detective Heidle introduced himself and Captain Pittman and said he was working on the case involving Brown.  Detective Heidle told Mr. Hickey that he wanted consent to search the area where Brown was arrested, which he believed was the back bedroom.  Mr. Hickey gave consent for Detective Heidle and Captain Pittman to come inside.  The officers searched a back room filled with boxes, which appeared to be a storage room, and found a pair of tennis shoes just inside the door.  Mr. Hickey told them the tennis shoes belonged to Brown.  The officers also found a ten-dollar bill in the back yard.

Around 1:00 p.m., after reviewing surveillance video at a gas station and eating lunch, Detective Heidle and Captain Pittman interviewed Defendant Brown at the Rhea County Sheriff's Department.  Detective Heidle explained a rights waiver form to Brown, who signed the form before the interview.  Detective Heidle wrote out the Defendant's statement, which the Defendant initialed and signed.  Detective Heidle then took custody of two necklaces, which were on the Defendant's person when he was arrested.

After interviewing Defendant Brown, Detective Heidle returned to the apartment complex where law enforcement found the victim's car.  Detective Heidle spoke with a female relative of Brown, who lived at the apartment complex, about gold one-dollar coins taken in the robbery.  The woman told Detective Heidle that Mr. Hickey had one of the gold one-dollar coins.  Detective Heidle and Captain Pittman returned to Mr. Hickey's house.  Detective Heidle told Mr. Hickey that they would like consent to search his residence again, because they were

11

told that he may have a gold one-dollar coin taken in the robbery. Mr. Hickey retrieved the coin and gave it to the officers, telling them he found it in Brown's shoes.

Detective Heidle returned to Mr. Hickey's house a third time on November 26, 2018. Detective Heidle gave Mr. Hickey a consent-to-search form, on which Detective Heidle had filled in the address, owner's name, date, and time. Detective Heidle explained the form to Mr. Hickey and told Mr. Hickey that they wanted to search his home but that he had the right to refuse the search. When Detective Heidle asked Mr. Hickey to sign the consent form, Mr. Hickey said he could not write. Detective Heidle then told Mr. Hickey to mark an "X" on the form as his signature. Detective Heidle and Officer Thomas Nelson also signed the form as witnesses. Detective Heidle looked around the living room of the home but did not seize any evidence. Mr. Hickey told Detective Heidle that he had a gold watch that Defendant had given him. Mr. Hickey gave the watch to Detective Heidle.

On December 19, 2018, Detective Heidle seized the Defendant's gray hoodie, worn at the time of his arrest, from the Hamilton County Sheriff's Department, pursuant to a search warrant. While there, Detective Heidle and Detective Sledge interviewed Defendant Brown a second time. Defendant again signed a rights waiver and gave a statement, which Detective Heidle wrote out and Brown initialed and signed.

## IV. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. To comport with the Constitution, searches must be pursuant to a warrant, which "shall issue[ only] upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* An individual's voluntary consent to an officer's entry into or search of his or her home is an exception to the

warrant requirement of the Fourth Amendment. A valid search of a premises may be made without a warrant and without probable cause if the person voluntarily consents to the search. *Schneckloth v. Bustamante*, 412 U.S. 218, 219, 228-29 (1973); *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011); *United States v. Van Shutters*, 163 F.3d 331, 335 (6th Cir. 1998). Whether this exception applies is evaluated by examining the totality of the circumstances, with the burden resting on the government to prove both actual consent and its voluntary nature. *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978). The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. *United States v. Hinojosa,* 606 F.3d 875, 881 (6th Cir. 2010); *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999).

In the instant case, Defendant Brown argues law enforcement violated his rights under the Fourth Amendment, when they searched his father's residence three times without a search warrant. He argues that on each of these occasions, his father did not give valid consent to search but, instead, merely acquiesced to the officers' authority. Defendant contends that because the initial search on November 24, 2018, was unlawful, all evidence that law enforcement seized after that time and both of his statements must be suppressed as fruit of the illegal search. The Court examines first whether Defendant Brown has a legitimate expectation of privacy in his father's residence. Then, the Court turns to the validity of Mr. Hickey's consent and what evidence is the fruit of the searches of Mr. Hickey's residence.

**A. Defendant Brown's Expectation of Privacy**

As an initial matter, the Court examines whether Defendant Brown has a legitimate expectation of privacy in Jackie Hickey's residence. *See United States v. Ellis*, 125 F. App'x 691, 695 (6th Cir. 2005) (holding that the court must examine a party's standing to challenge a search

even when the standing issue is not raised by the parties). The "rights assured by the Fourth Amendment are personal rights, and . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968). To contest whether a search comports with the Fourth Amendment, the defendant must have "a reasonable expectation of privacy" in the location searched. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). A defendant challenging a search has the burden of demonstrating his or her legitimate expectation of privacy in the location. *Id.* In assessing the reasonableness of a defendant's expectation of privacy, the Court examines

> "the person's proprietary or possessory interest in the place to be searched or item to be seized[;] whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises."

*United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)).

Not everyone legitimately in a place searched may challenge the legality of the search. *Rakas*, 439 U.S. at 134; *Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (holding defendants in another's apartment for a short time only to package cocaine had no legitimate expectation of privacy in the apartment). "Thus, an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Rakas*, 439 U.S. at 134.; *United States v. McNeal*, 955 F.2d 1067, 1071-74 (6th Cir. 1992) (affirming the district court's finding that the defendant, a "'casual transient visitor'" to another's apartment, lacked standing to challenge the officers' warrantless entry).

14

"[A] defendant ordinarily cannot challenge the search of a colleague's or relative's residence in which he has no interest, even though the search may have lacked probable cause and secured incriminating evidence." *United States v. Ferguson*, No. 10–20535, 2012 WL 628509, *7 (E.D. Mich. Feb. 27, 2012) (citing *Rakas*, 439 U.S. at 134). In contrast, an overnight social guest enjoys broad Fourth Amendment protections in the area where they sleep and in the common areas of a premises. *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018) (citing *Minnesota v. Oleson*, 495 U.S. 91, 96-97 (1990)). Thus, a legitimate expectation of privacy is typically "found where the defendant and the owner or manager of the residence have a preexisting personal (as opposed to business) relationship and the defendant has a right of access to that residence." *Ferguson*, 2012 WL 628509, at *7 (finding defendant had an expectation of privacy in a condominium owned by a relative's corporation, in which defendant had a right of access and in which he stored property and received mail).

In *United States v. Delgado*, the defendant challenged the search of his grandparent's home, from which police seized firearms, ammunition, body armor, cash, and an electronic scale. 121 F. Supp. 2d 631, 634 (E.D. Mich. 2000). The government argued that Delgado could not challenge the search of his grandparent's residence, because he did not live there. *Id.* at 634-35. Delgado submitted an affidavit stating he was close to his grandparents, whose home was open for him to stay at any time; that he stayed there occasionally; that he was permitted to store personal papers, clothing, and other items at their home; and that he expected that neither his grandparents, nor anyone else, would tamper with the items he stored there. *Id.* at 635. The district judge held that Delgado demonstrated both a subjective expectation of privacy in the residence and a substantial relationship to the residence that society would recognize to be

15

greater than that of a house guest. *Id.* at 639 (finding the defendant's "affidavit suggests that the residence was a second home for him").

In this case, Defendant Brown asserts that he has a legitimate expectation of privacy in his personal property (i.e., his tennis shoes) seized from his father's home. As Mr. Hickey's son and with no evidence to the contrary, the Court will assume that Defendant Brown was legitimately on the premises at the time of his arrest. However, the record is devoid of evidence that Defendant Brown had a proprietary interest in the residence, lived at the residence, or was even an overnight guest in the residence. Detective Heidle's testimony reveals that, at the time of his arrest, Defendant Brown had been at Mr. Hickey's residence only a short time and had not spent the preceding night there. Detective Heidle found the tennis shoes just inside the door to a back room used for storage. The record is similarly devoid of evidence that the other items or boxes in the room belonged to the Defendant, and Detective Heidle did not recall whether the door to the room was closed.

In the instant case, the Court finds that Defendant Brown has failed to carry his burden of showing that he has a legitimate expectation of privacy in Mr. Hickey's residence. For this reason, the undersigned respectfully recommends that Defendant's Motion to Suppress be denied. However, the Court recognizes that the Government appears to acquiesce in Defendant Brown's ability to challenge the search of his father's residence.[2] Accordingly, the Court will also analyze whether Mr. Hickey's consent to search his home was valid.

**B. Consent to Search**

As discussed above, voluntary consent by a person with authority is an exception to the warrant requirement of the Fourth Amendment. *Bustamante*, 412 U.S. at 219, 228-29.

---

[2] In his motion, Defendant argues that he has a legitimate expectation of privacy in his personal property at the residence [Doc. 81, p.5]. The Government does not respond to this argument.

"Consent to a search must be voluntary and free of duress or coercion, express or implied." *United States v. Thomas*, 662 F. App'x 391, 395 (6th Cir. 2016); *cert. denied* 137 S. Ct. 1599 (2017); *Worley*, 193 F.3d at 386 (requiring that consent to search be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion"). In determining whether consent was voluntary, the Court considers the totality of the circumstances, including the "characteristics" of the consenting individual, such as (1) the individual's age, intelligence, and education level; (2) whether the individual understood he had the right to decline to consent; and (3) whether the individual understood his constitutional rights. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). The Court also considers the "details of the detention," such as (4) the nature and duration of the detention; (5) whether law enforcement used coercive or punitive conduct; and (6) any "indications of 'more subtle forms of coercion that might flaw [an individual's] judgement.'" *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)); *see also Worley*, 193 F.3d at 386.

In the instant case, the Court finds that Detective Heidle, accompanied by one or two other officers, went to Jackie Hickey's home twice on November 24, 2018, and once on November 26, 2018, and that Detective Heidle asked Mr. Hickey for consent to search on each of these three occasions. Defendant argues that Mr. Hickey did not voluntarily consent to a search but, instead, merely acquiesced to the officers' authority. The Court examines each of the three incidents to determine whether Mr. Hickey gave consent and whether that consent was voluntarily given.

### (1) First Request to Search on Morning of November 24, 2018

Detective Heidle testified that he, Captain Pittman, and a local officer went to Mr. Hickey's residence on November 24, 2018, after Defendant Brown was arrested at that residence earlier that morning. Detective Heidle knocked on the door, and Mr. Hickey answered the door.

Detective Heidle, who was dressed in plain clothes, introduced himself and the other officers. Detective Heidle stated that he was aware that Mr. Hickey was partially deaf and that he increased his volume so Mr. Hickey could hear him. Detective Heidle told Mr. Hickey that he was working on the case involving Mr. Hickey's son. Detective Heidle said that he knew that Defendant Brown was arrested at Mr. Hickey's house and that he wanted consent to search the area where the Defendant was arrested, which he believed was the back bedroom. Detective Heidle testified that Mr. Hickey "went ahead and gave consent for me and my partner to come in" [Tr. at 20]. Detective Heidle then searched a back room that appeared to be a storage room and found a pair of tennis shoes. When Detective Heidle asked Mr. Hickey if the tennis shoes belonged to him, Mr. Hickey said they were Defendant's shoes. Detective Heidle seized the tennis shoes and a ten-dollar bill found in the back yard.

The Court first determines whether Mr. Hickey gave consent to search his home. "Consent to a search 'may be in the form of words, gesture, or conduct.'" *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) (quoting *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir.1976)), *cert. denied* 543 U.S. 1155 (2005). In the instant case, the Court finds that Mr. Hickey's act of inviting the officers to enter his house, after they asked to come in to search, was conduct indicating Mr. Hickey's consent to the search.[3]

Based upon the totality of the circumstances, the Court also finds that Mr. Hickey's consent was voluntarily given. First, the details of the encounter reveal that Mr. Hickey voluntarily consented. Mr. Hickey was in his own home, a familiar and comfortable environment, and was not detained. Detective Heidle informed Mr. Hickey that he and his fellow officers were law enforcement, that he was investigating Mr. Hickey's case, and that he wanted Mr. Hickey's

---

[3] The Court notes that Defendant Brown does not dispute whether Mr. Hickey gave consent to search but, instead, argues that Mr. Hickey's consent was not voluntary.

consent to search the area where the Defendant had been arrested. There is no evidence that the officers drew their weapons, attempted to deceive Mr. Hickey that they had a warrant, or made any threats of any type. *See United States v. Boyd*, 910 F. Supp. 2d 995, 1002 (W.D. Mich. 2011) (holding that trickery or misrepresentation about the nature of the investigation are relevant to the voluntariness of consent). Detective Heidle's testimony indicates his conversation with Mr. Hickey was cordial in tone. Moreover, the circumstances of the encounter reveal no efforts by law enforcement to engage in subtle forms of coercion.

Additionally, the characteristics of Mr. Hickey also reveal his consent was voluntary. The Court heard no testimony about Mr. Hickey's age, but the fact that Mr. Heidle has an adult son indicates that he also is an adult. Although Mr. Hickey had hearing difficulties, Detective Heidle stated he spoke loudly so that Mr. Hickey could hear him. Defendant argues that Mr. Hickey's limited education, which he infers from Mr. Hickey's subsequent inability to write, indicates that Mr. Hickey did not understand to what he was agreeing and, thus, did not voluntarily consent. An individual's illiteracy and limited schooling is a circumstance the Court may consider in determining whether consent to search was voluntarily given. *See United States v. Jones*, 846 F.2d 358, 360-61 (6th Cir. 1988) (holding that trial court failed to consider defendant's lack of formal education). However, in the instant case, the Court finds that Detective Heidle explained to Mr. Hickey that he was investigating Mr. Hickey's son and that he wanted Mr. Hickey's consent to search the area where the Defendant was arrested. There is no indication that Mr. Hickey did not understand Detective Heidle's request or its import.

Defendant also argues that because Detective Heidle did not use a consent-to-search form for the initial search, Mr. Hickey did not know he had the right to refuse the search. However, "knowledge of a right to refuse is not a prerequisite of a voluntary consent."

*Bustamonte*, 412 U.S. at 235. Instead, it is merely one of the total circumstances the Court must consider. Here, the Court finds that the totality of the circumstances reveals that Mr. Hickey voluntarily permitted the officers to search his home on the morning of November 24, 2018.

*(2) Second Request to Search on Afternoon of November 24, 2018*

Detective Heidle testified that he and Captain Pittman returned to Mr. Hickey's house on the afternoon of November 24, 2018, after interviewing a female relative, who told them that Mr. Hickey had a gold one-dollar coin. Once at Mr. Hickey's house, Detective Heidle told Mr. Hickey that he would like consent to search his residence again, because he was told that Mr. Hickey may have a gold one-dollar coin that was taken in the robbery. Mr. Hickey then retrieved the coin and gave it to the officers, telling them he found in it in the Defendant's shoes.

The Court finds that no second search of Mr. Hickey's house occurred on November 24, 2018. Instead, in response to Detective Heidle's request to search, Mr. Hickey produced the item sought and gave it to Detective Heidle. The Court also finds the officers did nothing coercive to inspire Mr. Hickey's cooperation. The evidence reflects no warrantless entry or search of Mr. Hickey's residence occurred on the afternoon of November 24, 2018.

*(3) Third Request to Search on November 26, 2018*

On November 26, 2018, Detective Heidle went to Mr. Hickey's residence for the third time, accompanied by Officer Nelson. Detective Heidle asked to search and gave Mr. Hickey a consent-to-search form, on which Detective Heidle had filled in the address, owner's name, date, and time. Detective Heidle explained the form to Mr. Hickey and told Mr. Hickey that they wanted to search his home but that he had the right to refuse the search. When Detective Heidle asked Mr. Hickey to sign the consent form, Mr. Hickey said he could not write. Detective Heidle then told Mr. Hickey to mark an "X" on the form as his signature, which Mr. Hickey did. Detective

Heidle and Officer Nelson also signed the form as witnesses. Detective Heidle searched the living room of the home but did not seize any evidence. While Detective Heidle was there, Mr. Hickey produced a gold watch, told Detective Heidle that Defendant had given him the watch, and gave the watch to Detective Heidle.

The Court again finds the circumstances of the encounter reveal Mr. Hickey's consent was voluntary. Two officers came to Mr. Hickey's residence and the consent form was signed at 8:35 p.m. Again, there is no evidence that the officers detained Mr. Hickey, drew their weapons, attempted to deceive Mr. Hickey that they had a warrant, made any threats of any type, or engaged in any subtle coercion. The Court also finds that Detective Heidle testified that he explained the contents of the consent-to-search form to Mr. Hickey. The consent form informs the individual of their right to refuse to search and states the signer agrees that consent is given voluntarily without any threats or promises [Exh. 7]. Detective Heidle testified that he explained to Mr. Hickey that he had the right to refuse consent to search. As discussed in relation to the search of the residence on the morning of November 24, 2018, nothing about the circumstances of the encounter reveals that Mr. Hickey's inability to write meant that he could not understand the officer's request for consent to search, particularly in light of the officer's explanation of the consent form. Mr. Hickey's production of a watch of his own accord indicates that Mr. Hickey was not just acquiescing to law enforcement's authority but, instead, was actively cooperating with the search. The Court finds from the totality of the circumstances that Mr. Hickey voluntarily consented to the search of his residence on November 26, 2018.

In summary, the Court finds that Mr. Hickey voluntarily consented to the search of his home on November 24 and 26, 2018, and, thus, Defendant's Motion to Suppress should be denied.

### C. Fruit of the Searches

Finally, the Court turns briefly to the question of what evidence is the "fruit" of Mr. Hickey's consent to search his home on November 24 and 26, 2018. When a search is deemed unlawful, the government may not benefit from the physical items seized in that search or from any evidence otherwise derived from the search, such as an individual's statement or "matters observed during an unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963). Such wrongfully gained evidence or observation is the "fruit" of the "official illegality" and cannot be used unless knowledge of the evidence or observations can be gained from an independent source. *Id.* This "fruit of the poisonous tree doctrine," as it has come to be known, "bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008).

In the instant case, the Court finds that none of the evidence seized from Ms. Quall's car [Exh. 2] was the fruit of the searches of Mr. Hickey's residence. Detective Heidle searched Ms. Quall's car, pursuant to her consent, *before* he went to Mr. Hickey's residence and asked to search. Thus, the evidence seized from Quall's car cannot be the fruit of the search of Defendant's father's residence. Similarly, the necklaces on Defendant's person at the time of his arrest [Exh. 5] were seized before the search of Mr. Hickey's residence. The Court also finds that any evidence obtained from the convenience store, such as surveillance video, resulted from an independent source, which is law enforcement's use of the tracking device in Ms. Quall's car, rather than Detective Heidle's search of Mr. Hickey's residence.

The Court finds a significant intervening event—Defendant's waiver of his rights—dissipated any taint from an illegal search of Mr. Hickey's residence as to Defendant's two statements. *See United States v. Buchanan*, 904 F.2d 349, 355-56 (6th Cir. 1990) (holding that

"[d]issipation of the taint resulting from an illegal entry 'ordinarily involves showing that there was some significant intervening time, space, or event'"). Police had already identified Defendant Brown as a suspect in the robbery and arrested him before Detective Heidle went to Mr. Hickey's residence. Defendant Brown signed a Waiver of Rights form [Exhs. 4 & 10] prior to giving statements on the afternoon of November 24, 2018 and December 19, 2018. Defendant does not contest the voluntariness of his statements. The Court finds the time between the searches and the statements (a couple of hours for the November 24 statement and three weeks for the December 19 statement), the differing locations, and the intervening event of the rights waivers were sufficient to dissipate any taint arising from the searches of Mr. Hickey's residence.

Finally, Detective Heidle seized the Defendant's hoody, which he was wearing at the time of his arrest, three weeks after Mr. Hickey consented to the searches of his residence and pursuant to a search warrant [Exh. 9]. The Court finds the seizure of the hoody was sufficiently attenuated from the searches of Mr. Hickey's residence that it was not the fruit of those searches.[4] *See United States v. Gross*, 662 F.3d 393, 406 (6th Cir. 2011) (determining a DNA swab obtained several days after illegal stop and arrest was sufficiently attenuated such that it was not the fruit of the illegality). Thus, if the District Judge determines that Mr. Hickey did not voluntarily consent to the searches of his residence, the undersigned finds that only the tennis shoes, ten-dollar bill,

---

[4] The affidavit [Exh. 9] in support of the search warrant states that Defendant Brown was captured on the convenience store surveillance video wearing a gray hooded jacket, gray sweatpants, and gray tennis shoes. It further states that when Detective Heidle interviewed Defendant Brown at the Rhea County Sheriff's Department later that day, Brown was wearying the gray hooded jacket and gray sweatpants but not the gray tennis shoes. The affidavit states the gray tennis shoes were seized from the back bedroom of Brown's father's house. This is the only reference to evidence seized from the searches of Mr. Hickey's house. The Court finds this statement about the seizure of the tennis shoes does not make the seizure of the hooded sweatshirt, which was on the Defendant's person at the time of the search of Mr. Hickey's residence, the fruit of the searches.

and gold one-dollar coin seized on November 24, 2018, and the gold watch seized on November 26, 2018, are subject to suppression.[5]

## V. CONCLUSION

After carefully considering the parties' filings and arguments, the evidence and exhibits presented, and the relevant legal authorities, the Court finds that Defendant Brown does not have a legitimate expectation of privacy in his father's residence. The Court also finds that law enforcement searched Defendant's father's residence pursuant to his father's valid and voluntary consent and that only a pair of tennis shoes, a ten-dollar bill, a gold coin, and a gold watch were seized pursuant to Defendant's father's consent or cooperation. For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 81] be **DENIED**.[6]

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[5] The Court notes that the gold coin and the watch were not found during the searches of Mr. Hickey's residence but, instead, were given to Detective Heidle by Mr. Hickey. From Detective Heidle's testimony, it appears that Mr. Hickey produced the watch without Detective Heidle asking about it. However, the Court will not attempt to determine from the sparse record whether the coin and the watch should be treated differently from the tennis shoes and the ten-dollar bill. If Mr. Hickey's consent was due to his acquiescence to law enforcement's authority, the Court finds it impossible to determine whether his production of the coin and the watch was not also part of that acquiescence.

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

24